IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

VERONICA V. BURROLA,

       Plaintiff,

v.                                                                                          CIV 10-770-GBW

SOCIAL SECURITY ADMINISTRATION,
Michael J. Astrue, Commissioner,

       Defendant.

## MEMORANDUM OPINION & ORDER

       This matter is before the Court on Plaintiff's Motion to Reverse or Remand Administrative Agency Decision due to an ALJ error at Step 3. *Doc. 19*. Having carefully considered the record and reviewed the parties' arguments as well as the applicable law, I find the motion unpersuasive and will deny it.

## Facts

       Plaintiff Veronica Burrola filed for disability benefits on March 22, 2007, due to the alleged impairments of ADHD, carpal tunnel syndrome, degenerative joint disease (DJD), and an "old fracture of ankle." *AR* at 32, 155. At that time, she was 28 years old. *AR* at 24.[1] She alleged disability as of February 15, 2005. *AR* at 32. Disability insurance was denied on July 20, 2007, and again upon reconsideration on October 19, 2007. *AR* at

---

[1] Ms. Burrola's date of birth is June 9, 1978. *AR* at 24.

32. Plaintiff then requested a hearing, and she was given one on January 26, 2009. *Id*. Although Plaintiff has mental and social impairments, because Plaintiff's Motion to Remand only concerns the ALJ's alleged error in failing to consider whether Plaintiff's DJD and morbid obesity established disability at Step 3 of the review, this opinion focuses on the evidence and testimony relevant to those physical impairments.

The medical evidence suggests that Ms. Burrola had problems with her left knee during the relevant period, though the evidence would support a broad range of findings as to the severity of Ms. Burrola's symptoms. In the two years prior to Plaintiff's ALJ hearing on January 26, 2009, Plaintiff had multiple doctor visits that noted she was between five foot two inches and five foot four inches tall, and she weighed approximately 300 pounds. *See e.g. AR* at 305, 424, 436, 447, 471, 474.

On January 29, 2007, Plaintiff had an X-ray of her left knee. *AR* at 313. Dr. Durand gave the following impression of the X-ray: "Moderately severe degenerative disease and narrowing of the medial compartment with medial marginal osteophytes. Possible loose body over the popliteal area. No acute fracture of dislocation." *Id.* The next month Plaintiff saw Dr. Lashinsky, who diagnosed her with severe degenerative joint disease of the left knee and gave her a prescription for a cane. *AR* at 305-06. In July of 2007, Plaintiff was examined by an SSA doctor for a mental status evaluation. *AR* at 366-69. He noted that Plaintiff "exhibited minimal pain behavior," and although she had a cane, "when she walked, the tip of the cane rarely touched the ground." *AR*

at 366.  In December of that year Plaintiff was seen by Dr. Andrews, and in his treatment notes he wrote:

> Pt's real concern is how she is going to be able to work or do the required community service if she needs to take care of her chiledren [sic].  I have told her that she has no reason directly why she should be considered disabled.  If, however, the child care is an issue–it is a very real one, but not one that raises [sic] to the level of a medical disability for mom to not work.

*AR* at 474.

In January of 2008, Plaintiff returned to Dr. Andrews complaining of increased pain in her left knee, and he ordered an MRI.  *AR* at 470.  The "Impression" section of the MRI report reads: "Pronounced degenerative joint change in the medial weight bearing compartment where there is bone on bone articulation and significant remodeling and reactive edema with marginal osteophytes.  Less prominent degenerative in the lateral weightbearing compartment."  *AR* at 419.  Dr. Andrews then referred Plaintiff to Dr. Schwartz for her knee pain, and Dr. Schwartz observed that Plaintiff experienced pain in her left knee and walked with a gonalgia limp.  *AR* at 425.  Dr. Schwartz further opined that none of the available treatment options were appropriate for the Plaintiff because her morbid obesity and young age.  *AR* at 423, 425.  He noted "I have little to offer the patient other than to seek help to loose [sic] the massive amount of weight she has and at that point then reassess her symptoms and look at her treatment options."  *AR* at 425.  In April of 2008, Plaintiff returned to Dr.

Andrews for a follow-up visit. *AR* at 447-48. There, Plaintiff reported walking with her kids about an hour a day. *AR* at 447. The doctor also noted that as to her morbid obesity, "Pt is making some progress. Got two puppies and is getting more exercise." *AR* at 448. As to Plaintiff's DJD, the doctor noted: "Referral done to ortho but they refused surgery at this age and weight. She now finds the knee pain is much less with exercise and better diet." *Id*. Finally, Dr. Andrews also wrote that Plaintiff's gait was "WNL [within normal limits] for pt." *AR* at 447. On December 31, 2008, Plaintiff returned to Dr. Andrews' office and was seen by CNFP Jones for a follow-up appointment for some earlier trouble with diarrhea. *AR* at 436. CNFP Jones' treatment notes repeat the findings from the April appointment that Plaintiff is making progress on her obesity, that she is getting more exercise, and that "she now finds the knee pain is much less with exercise and better diet." *AR* at 437.

Plaintiff's written and oral accounts of her pain, ability to move and ambulate, and daily activities could also support a broad range of findings as to the severity and limiting effects of Ms. Burrola's symptoms. In her Function Report, filled out on April 14, 2007, Plaintiff wrote that she bathes, dresses, and cooks for her children and herself, and that she cleans the house and does the laundry. *AR* at 146. Strangely, she then checked the box indicating that she does not take care of any other people (including children). *AR* at 147. She also checked the next box indicating that no one helped her care for other people. *AR* at 147.

4

The sum of Plaintiff's responses in the Report indicate a fairly active lifestyle. She noted that on a daily basis she does laundry, cleans, leaves the house with her twins, and plays outside with her twins. *AR* at 148-50. She also stated that she drives to stores to shop, and each shopping event takes about 45 minutes to an hour. *AR* at 149. She further noted that she liked to go to the store with other people and regularly took her grandmother to the store or doctor's offices. *AR* at 150. In the "Information About Abilities" section, Plaintiff checked the following items that her "illnesses, injuries, or conditions affect:" Standing, Kneeling, Memory, and Completing Tasks. *AR* at 151. She did not check Lifting, Squatting, Bending, Reaching, Walking, Sitting, or Stair Climbing. *Id*. In the narrative section she wrote "if I stand for a long time my ankle start hurt [sic] and if I kneel my knee start hurt [sic] really bad." *Id*. In response to "How far can you walk before needing to stop and rest?" Plaintiff wrote "i can walk for a long." *Id*. In response to "If you have to rest, how long before you can resume walking?" Plaintiff wrote: "i my need to rest for about 10 minutes to 30 minutes to rest." *Id.* Finally, she noted that she used a cane and a brace everyday. *AR* at 152.

At the ALJ hearing on January 26, 2009, Plaintiff described her symptoms, abilities, and activities differently. Plaintiff testified that she was in pain a lot, that the pain in her knee was so severe she cried some days, and that the pain made it very difficult to walk. *AR* at 5, 7. She also testified that she could only walk ten feet, and that she could only stand for less than five minutes and then would have to sit for at

least two hours. *AR* at 8. She then explained that her mother and sister helped her care for her three-year-old twins, one of whom is autistic, almost every day, and that her mother once reported her to Children and Youth Services because she believed Plaintiff was neglecting her children. *AR* at 6, 8, 9. She also testified that if she put any pressure on her knee it would sprain or dislocate, and that she was not physically able to perform previous work that required her to squat and bend. *AR* at 12.

ALJ Dawson administered the disability hearing, and he issued his opinion on April 10, 2009. *AR* at 32, 40. In that opinion, he found that the claimant suffered from the following severe impairments: "morbid obesity; degenerative changes, medial left knee, severe; personality disorder; language (expressive and receptive) delays and a somatoform disorder." *AR* at 34. Nevertheless, he also found that those impairments, singly or in combination, failed to rise to the requirements for a Step 3 listing. *AR* at 36. Additionally, he found that Plaintiff had the residual functional capacity to perform light work except that she "can only occasionally perform postural maneuvers [and] [t]he claimant cannot work jobs that require language or social interaction as a primary requirement." *AR* at 37. Although he found that Plaintiff could not perform past work, he denied benefits at Step 5 based on testimony elicited from a Vocational Expert (VE) that an individual with the limitations given by the ALJ could still perform the duties of a laundry folder, assembler, and food assembler. *AR* at 39. The Appeals Council denied review on June 18, 2010, thereby rendering the ALJ's decision final. *AR* at 41.

In the Motion to Reverse or Remand, Claimant asserts that the ALJ committed error due to the ALJ's failure to discuss the evidence or his reasons for determining that she was not disabled under listing § 1.02 in Step 3 of the sequential analysis. *Doc. 19* at 7-13. She also takes issue with how the ALJ squared her conflicting accounts of her physical abilities and activities of daily living. *Id.* at 13. If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and Plaintiff is not entitled to relief. *E.g., Grogan v. Barnhart*, 399 F.3d 1257, 1261-62 (10th Cir. 2005); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118 (internal quotations and citations omitted); *see also Hamlin*, 365 F.3d at 1214; *Doyal*, 331 F.3d at 760. An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley*, 373 F.3d at 1118 (internal quotations and citations omitted); *see also Hamlin*, 365 F.3d at 1214. My assessment is based on a meticulous review of the entire record, where I can neither re-weigh the evidence nor substitute my judgment for that of the agency. *Hamlin*, 365 F.3d at 1214; *see also Langley*, 373 F.3d at 1118. For the reasons given below, I find that the ALJ's failure to identify and discuss the listing at § 1.02 at Step 3 was error; however, I do not find that the ALJ ignored highly probative

evidence, and other findings within his opinion demonstrate that Plaintiff could not meet listing § 1.02. Additionally, I find his credibility determination valid. Therefore, I find the error harmless and will deny the Motion to Reverse or Remand.

## Analysis

**Relevant Legal Landscape.**

The Tenth Circuit has held that an ALJ who fails to discuss the evidence or his reasons for determining that an applicant is not disabled at Step 3 states a "bare conclusion" that is "beyond meaningful judicial review." *Clifton v. Chater*, 79 F. 3d 1007, 1009 (10th Cir. 1996). Such a summary conclusion indicates that, if there is an insufficient discussion in Step 3, the case must be remanded. *Id*. at 1010. Later, however, the Tenth Circuit clarified that *Clifton* did not foreclose the possibility of a harmless error analysis. *Fischer-Ross v. Barnhart*, 431 F.3d 729 (10th Cir. 2005). Specifically, *Fischer-Ross* held that *Clifton* does not require reversal where "an ALJ's findings at other steps of the sequential process . . . provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment." *Id*. at 733. In coming to its holding, the *Fischer-Ross* court specifically noted: "we reject a construction of *Clifton* that, based on a reading of the ALJ's decision as a whole, would lead to unwarranted remands needlessly prolonging administrative proceedings," and "[n]either *Clifton's* letter nor spirit require a remand for a more thorough discussion of the listings when confirmed or unchallenged findings

8

made elsewhere in the ALJ's decision confirm the step three determination under review." *Id*. at 731, 734. Nonetheless, a finding of harmless error is warranted only where the ALJ's discussion of the other steps "conclusively negate[s] the possibility of any finding that Claimant is presumptively disabled under the pertinent listing." *Dye v. Barnhart*, 180 F. App'x 27, 29 (10th Cir. 2006) (*quoting Fischer-Ross*, 431 F.3d at 735).

Importantly, the burden is on the claimant at Step 3 to present evidence establishing that her impairment(s) meet the relevant listing. *See Fischer-Ross*, 431 F.3d at 733. "To satisfy this burden, plaintiff must show that her [] impairment 'meet[s] *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'" *Baldwin*, 167 F. App'x at 51-52 (citing *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990)). It is not the role of this Court to weigh the evidence. *Clifton*, 79 F.3d at 1009. When considering reasons that an ALJ may have had for crediting or discrediting evidence, "[j]udicial review is limited to the reasons stated in the ALJ's decision." *Carpenter*, 537 F.3d at 1267.

**ALJ Erred by Failing to Discuss Listing 1.02**.

At Step 2, the ALJ found that Claimant did have a severe impairment relevant to her left knee – "degenerative changes, medial left knee, severe." *AR* at 34; *see also id.*("claimant has severe left knee degenerative joint disease" with "bone on bone articulation"). At that same step, the ALJ also found that Claimant suffered from

"morbid obesity." *Id.* Nonetheless, at Step 3, the ALJ failed to mention Claimant's knee problems when he made his determination at Step 3 that none of Claimant's impairments met or equaled an impairment listed in the relevant Appendix.[2]

Claimant identifies section 1.02 of the Appendix as the listing which should have been addressed by the ALJ. That listing covers major dysfunctions of joints. *See* 20 C.F.R. Pt. 404, Subpt. P. App. 1., § 1.02. Given the ALJ's findings in Step 2 that Claimant had severe impairment of her left knee, the failure to discuss why those impairments did not meet a 1.02 listing in Step 3 was error. *See Clifton*, 79 F.3d at 1009.

**Other Findings Provide Proper Basis for Upholding Conclusion.**

Despite this error, *Fischer-Ross* requires this Court to determine if the "ALJ's findings at other steps of the sequential process . . . provide a proper basis for upholding a step three conclusion that a claimant's impairments do not meet or equal any listed impairment." *Fischer-Ross*, 431 F.3d at 733. Listing 1.02 reads as follows:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).

20 C.F.R. Pt. 404, Subpt. P. App. 1., § 1.02. As it is Ms. Burrola's knee that is at issue,

---

[2] In his Notice of Decision, the ALJ's Step 3 analysis instead addressed the mental impairments he found in Step 2 and whether they met the listings at sections 12.07 or12.08. *AR* at 36. As mentioned above, Claimant does not dispute the conclusion that she does not meet those listings.

subsection A of the listing further requires that the dysfunction result in the "inability to ambulate effectively, as defined in 1.00B2b." Section 1.00B2b explains what is required to show an inability to ambulate effectively:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)
>
> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance *to be able to carry out activities of daily living*. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, *examples of ineffective ambulation include*, but are not limited to, *the inability to walk without* the use of a walker, two crutches or *two canes*, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the *inability to carry out routine ambulatory activities, such as shopping* and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P. App. 1., § 1.00B2b (emphasis added). Here, the ALJ's findings at Steps 3 and 4 conclusively show that Plaintiff could not meet listing 1.02's requirement of being unable to ambulate effectively, and therefore I find that the ALJ's error was harmless.

First, there is no evidence, and Claimant does not now argue, that she was

11

unable to walk without the use of a walker, two crutches or two canes. In fact, the ALJ even called into question whether she needed even the one cane she did use. *AR* at 35 (noting that one medical assessor observed that Plaintiff "used a cane but when she walked, the tip of it rarely touched the ground."). Of course, these examples are not requirements of a finding of ineffective ambulation. The touchstone is whether the person is "capable of sustaining a reasonable walking pace over a sufficient distance *to be able to carry out activities of daily living*. They must have the ability to travel without companion assistance to and from a place of employment or school." 20 C.F.R. Pt. 404, Subpt. P. App. 1., § 1.00B2b (emphasis added). The ALJ's findings in two separate portions of his decision make it clear that Claimant cannot meet this standard. In his Step 3 analysis, the ALJ found that "[i]n activities of daily living, the claimant has no restriction. The claimant cares for her twins. In her paperwork, the claimant reported that she cleaned her mobile home, made breakfast and lunch for her kids, did laundry and made dinner for her family. The claimant is able to drive and could shop." *AR* at 36. Later, in the Step 4 analysis, immediately after discussing her knee problem, the ALJ reiterated that "Ms. Burrola is able to care for her twins, keep house, cook, drive and shop." *AR* at 38. A person found to have no restrictions in activities of daily living must be able to ambulate effectively, and if she can ambulate effectively, she cannot

meet the listings for § 1.02.³  Therefore, the findings "conclusively negate the possibility of any finding that Claimant is presumptively disabled under the pertinent listing." *Fischer-Ross*, 431 F.3d at 735.  Thus, the ALJ's error in Step 3 was harmless.

**ALJ Did Not Ignore Highly Probative Evidence.**

Claimant argues, however, that the harmless error analysis of *Fischer-Ross* ought not to be applied in the instant case because the ALJ ignored highly probative evidence on the issue of the 1.02 listing.  Indeed, when applying the harmless error analysis, courts should ensure that the ALJ did not ignore highly probative evidence which would "demonstrate that the [claimant] fulfills the criteria to meet a [particular] Listing."  *Dye*, 180 F. App'x at 30.

Claimant argues that the ALJ ignored highly probative evidence that objectively established she met the listing at § 1.02.  *Doc. 19* at 11-12.  Specifically, she argues that Plaintiff's prescription for a cane, knee x-ray that revealed "moderately severe degenerative disease and narrowing of the medial compartment...," Dr. Andrew's observation that Plaintiff had pain in her left knee, and  Dr. Schwartz' findings that

---

³ Because the ALJ made the finding in Step 3 in the context of analyzing Plaintiff's mental impairments, that finding may not be a conclusive evaluation of Plaintiff's physical impairments.  *See e.g. Peck v. Barnhart*, 214 F. App'x 730, 736-37 (10th Cir. 2006).  Here, however, the ALJ repeated his findings in the Step 4 section, immediately after discussing Plaintiff's knee problem.  *AR* at 38.  Consequently, the ALJ's determination as to Plaintiff's activities of daily living are relevant to the § 1.02 listing. *See e.g. Stokes v. Astrue*, 274 F. App'x 675, 679-82 (10th Cir. 2008)(error was harmless where other findings demonstrated claimant's activities of daily living could not be markedly restricted as required for the relevant listing).

13

Plaintiff had pain in her left knee and walked with a gonalgia limp (*see AR* at 306, 313, 425, 470) are all highly probative evidence demonstrating that Plaintiff meets the listing at § 1.02.  *Doc. 19* at 11-12.

The ALJ need not discuss every piece of evidence, but he must discuss significantly probative evidence that he rejects.  *Clifton*, 79 F.3d at 1010.  The Court in *Dye* found that the ALJ had impermissibly ignored highly probative evidence, but that evidence was the result of an exercise test specifically showing Plaintiff's failure to increase her systolic blood pressure by 10 mmHg, which was one of the enumerated ways a claimant could establish that she met the requirements for the relevant listing.  *Dye*, 180 F. App'x at 30.   Thus, the piece of evidence that was not addressed by the *Dye* ALJ, if accepted, would have been dispositive of whether the *Dye* claimant met the relevant listing.

The evidence Ms. Burrola points to here is not similarly dispositive.  To meet the listing at § 1.02, a claimant must demonstrate that (1) her knee has the characteristics of a major dysfunction of a joint,[4] *and* (2) that it prevents her from ambulating effectively. 20 C.F.R. Pt. 404, Subpt. P. App. 1., § 1.02; see also *Baldwin*, 167 F. App'x at 51-52 (citing *Sullivan v. Zebley*, 493 U.S. 521, 530(1990)("Plaintiff must show that her [] impairment

---

[4] The dysfunction must have all of the following: (a) gross anatomical deformity; (b) chronic joint pain and stiffness; (c) signs of limitation of motion or other abnormal motion of the affected joint, and (d) findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint.  20 C.F.R. Pt. 404, Subpt. P. App. 1., § 1.02.

'meet[s] *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify'").  None of the pieces of evidence that Claimant argues the ALJ ignored establish that she could not ambulate effectively.  That evidence would be relevant to, although not dispositive of, whether her knee possessed some of the required characteristics such as pain or limitation of motion.[5]  It is not, however, highly probative of whether Plaintiff has "an extreme limitation of the ability to walk. . . that interferes very seriously with [her] ability to independently initiate, sustain, or complete activities. "   20 C.F.R. Pt. 404, Subpt. P. App. 1., § 1.00B2b.

Consequently, the ALJ did not ignore evidence which was highly probative of the ineffective ambulation requirement of Listing 1.02.  Thus, *Dye* does not mandate remand in this case.

**ALJ's Credibility Findings Were Linked to Appropriate and Substantial Evidence.**

Plaintiff argues that the ALJ's credibility findings with respect to Plaintiff's hearing testimony were erroneous.  *Doc. 19* at 13; *Fischer-Ross*, 431 F.3d at 735.  Specifically, Plaintiff argues that her testimony at the ALJ hearing that (1) she could

---

[5] In fact, the ALJ appears to concede in his analysis at Step 4 that Plaintiff has the characteristics of the major dysfunction of a joint.  *AR* at 34, 38 (noting that Plaintiff's 2008 MRI revealed pronounced degenerative joint change and bone on bone articulation, then later finding: "[t]he claimant does have severe degenerative joint disease of the left knee but. . . .").  So, it is questionable to assert that the ALJ ignored the evidence of knee problems.

15

only walk ten feet, and that she could only stand for less than five minutes and then would have to sit for at least two hours, (2) her mother and sister helped her care for her three-year-old twins, one of whom is autistic, almost every day, and that (3) her mother once reported her to Children and Youth Services because she believed Plaintiff was neglecting her children, all refute the ALJ's RFC finding and demonstrate that the ALJ erred in his credibility analysis. *Doc. 19* at 13; *AR* at 6, 8, 9.

      This Court cannot reweigh the evidence and can only review the ALJ's decision to ensure he applied the correct legal standard and his findings are supported by substantial evidence. *Clifton*, 79 F.3d at 1009. "Credibility determinations are peculiarly the province of the finder of fact, and [the Court] will not upset such determinations when supported by substantial evidence." *Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir. 1995) (quotation omitted). Boilerplate language is insufficient. *E.g., id.; see also, e.g., Carpenter v. Astrue,* 537 F.3d 1264, 1266-70 (10th Cir. 2008); *Hardman v. Barnhart,* 362 F.3d 676, 679 (10th Cir. 2004). Instead, "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Kepler,* 68 F.3d at 391 (internal quotation marks and brackets omitted). However, the Tenth Circuit does not "reduce[] credibility evaluations to formulaic expressions" and it "'does not require a formalistic factor-by-factor recitation of the evidence. So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied.'" *White v. Barnhart*, 287

16

F.3d 903, 909 (10th Cir. 2001) (quoting *Qualls v. Apfel,* 206 F.3d 1368, 1372 (10th Cir. 2000)). Finally, where pain is the subject of the credibility dispute,

> the ALJ should consider such factors as, "the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence."

*Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993)(citing *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991)).

When making his credibility findings, the ALJ sufficiently linked those findings to substantial evidence. Foremost, the ALJ alludes to the inconsistencies between what Claimant originally reported as her activities of daily living and her hearing testimony. *AR* at 38 ("[T]he above [RFC] is supported by the record as a whole, including the claimant's reported activities of daily living. Ms. Burrola is able to care for her twins, keep house, cook, drive, and shop."). The ALJ had earlier adopted the account of Plaintiff's daily activities as Plaintiff herself reported in her Function Report and that account conflicted with Plaintiff's hearing testimony. *Compare AR* at 146-52 (reported activities) *to AR* at 37-38 (hearing testimony). Second, the ALJ found that Claimant was motivated to exaggerate her conditions because she was stressed by working and taking care of her twins, and wished to "be a stay-at-home mother." *AR* at 38. Third, the ALJ noted that the evidence from medical providers corroborated only that her "knee

problem limit[ed] her to occasionally performing postural maneuvers." This statement, of course, follows the earlier finding that a doctor had observed that, although "she used a cane . . . when she walked, the tip of it rarely touched the ground." *AR* at 35. Finally, the ALJ relied on the fact that, although Plaintiff has joint disease in her left knee, she had some control over the effects of her condition given that she reported that her pain improved when she followed her doctors' suggestions to lose weight and get more exercise. *AR* at 38. Consequently, I find that the ALJ here closely and affirmatively linked his credibility finding to appropriate, substantial evidence, and, as such, committed no reversible error in relation to that finding. *See Kepler*, 68 F.3d at 391.

### III. Conclusion

Having found that the ALJ's Step 3 error was harmless and his credibility determination valid, IT IS HEREBY ORDERED THAT Claimant's Motion to Remand be DENIED and the case dismissed.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by consent